**IN THE UNITED STATES COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NICHOLAS BENTIVEGNA and TERESA BENTIVEGNA, | ) Civil Action No. |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) **JURY TRIAL DEMANDED** |
| v. | ) |
| | ) |
| HAMPTON TOWNSHIP SCHOOL DISTRICT; HAMPTON TOWNSHIP; ALLEGHENY COUNTY; ALLEGHENY COUNTY BOARD OF PROPERTY ASSESSMENT APPEALS AND REVIEW; DENISE BALASON; JILL HAMLIN; MATTHEW A. JARRELL; JOY S. MIDGLEY; ROBERT J. SHAGES; GREGORY A. STEIN; LARRY J. VASKO; TRISHA MARIE WEBB; BRYANT WESLEY; JENNY L. KENNEDY; MAUREEN FARRELL PERKINS; | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | |

**COMPLAINT IN CIVIL ACTION AND FOR DECLARATORY RELIEF**

AND NOW, come Plaintiffs, Nicholas Bentivegna and Teresa Bentivegna, by and through their attorneys, George R. Farneth II, Esquire and The Farneth Law Group, LLC, and Nicholas A. Miller, Esquire and Brenlove & Fuller, LLC, and file this Complaint in Civil Action and For Declaratory Relief, averring as follows:

**THE PARTIES**

1.     Plaintiffs, Nicholas Bentivegna ("Mr. Bentivegna") and Teresa Bentivegna. ("Plaintiffs") are adult individuals, who are husband and wife and who reside in Cambria County, Pennsylvania which is in the Western District of Pennsylvania.

2.     Defendant, Hampton Township School District ("School District") is a public School District that was and is chartered under the laws of the Commonwealth of Pennsylvania, is

located within Hampton Township, Allegheny County, Pennsylvania, and, at all times pertinent hereto, was purporting to act within the full scope of its authority, and under color of state law, with its principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

3.     Defendant, Hampton Township ("Township") is a municipal corporation that was and is chartered under the laws of the Commonwealth of Pennsylvania, is located within Allegheny County, Pennsylvania, and, at all times pertinent hereto was purporting to act within the full scope of its authority, and under color of state law, with its principal place of business located at 3101 McCully Road, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

4.     Defendant, Allegheny County ("County") is a Second-Class County that was and is chartered under the laws of the Commonwealth of Pennsylvania, purporting to act within the full scope of its authority, and under color of state law, with its principal place of business and/or service address located at the Allegheny County Solicitor, 300 Fort Pitt Commons Building, 445 Fort Pitt Boulevard, Pittsburgh, Pennsylvania 15219 which is in the Western District of Pennsylvania.

5.     Defendant, Allegheny County Board of Property Assessment, Appeals, and Review ("BPAAR") is an Administrative Agency of Allegheny County that was and is chartered under Article 207 of the Allegheny County Administrative Code and other applicable law, purporting to act within the full scope of its authority, and under color of state law, with its principal place of business located at Board Solicitor, 345 County Office Building, Pittsburgh, Pennsylvania 15219 which is in the Western District of Pennsylvania.

6.     Defendant, Denise Balason ("Balason") is an adult individual who is being sued in her individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of her authority and office, and under color of state law, with her principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

7.     Defendant, Jill Hamlin ("Hamlin") is an adult individual who is being sued in her individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of her authority and office, and under color of state law, with her principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

8.     Defendant, Matthew A. Jarrell ("Jarrell") is an adult individual who is being sued in his individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of his authority and office, and under color of state law, with his principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

9.     Defendant, Joy S. Midgley ("Midgley") is an adult individual who is being sued in her individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of her authority and office, and under color of state law, with her principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

10.     Defendant, Robert J. Shages ("Shages") is an adult individual who is being sued in his individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of his authority and office, and under color of state law, with his principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

11.     Defendant, Gregory A. Stein ("Stein") is an adult individual who is being sued in his individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of his authority and office, and under color of state law, with his principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

12.     Defendant, Larry J. Vasko ("Vasko") is an adult individual who is being sued in his individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of his authority and office, and under color of state law, with his principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

13.     Defendant, Trisha Marie Webb ("Webb") is an adult individual who is being sued in her individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of her authority and office, and under color of state law, with its principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

14.    Defendant, Bryant Wesley ("Wesley") is an adult individual who is being sued in his individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of his authority and office, and under color of state law, with his principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

15.    Defendant, Jenny L. Kennedy ("Kennedy") is an adult individual who is being sued in her individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of her authority and office, and under color of state law, with its principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

16.    Defendant, Maureen Farrell Perkins ("Perkins") is an adult individual who is being sued in her individual and official capacities, who at times pertinent hereto, was a duly elected School Director of the School District, purporting to act within the full scope of her authority and office, and under color of state law, with its principal place of business located at 4591 School Drive, Allison Park, Pennsylvania 15101 which is in the Western District of Pennsylvania.

17.    Balason, Hamlin, Jarrell, Midgley, Shages, Stein, Vasko, Webb, Wesley, Kennedy, and Perkins will sometimes hereinafter be collectively referred to as "School Directors."

18.    School District, Township, County, BPAAR, and School Directors will sometimes hereinafter be collectively referred to as "Defendants."

19.    At all times pertinent hereto, School District was acting by and through its authorized agents, servants, employees, representatives, attorneys, solicitors, and ostensible agents, including but not limited to School Directors, Balason, Hamlin, Jarrell, Midgley, Shages, Stein, Vasko, Webb, Wesley, and Kennedy,  as well as its Solicitors, Goehring Rutter & Boehm ("GRB"), Donald J. Palmer ("Palmer"), Jessica L. Crown ("Crown"), Jacob T. Leyland ("Leyland"), and Kate M. Diersen ("Diersen"), who were at all times acting within the course and scope of their employment or apparent employment with and/or as agents and/or representatives of School District, with the actual and/or apparent authority to do so, and in furtherance of the business operations and for the financial benefit of School District.

20.    At all times pertinent hereto, GRB, Palmer, Crown, Leyland, and Diersen were duly appointed Solicitors of School District who were purporting to act within the full scope of the Solicitor's authority and office, and under color of state law.

21.    GRB, Palmer, Crown, Leyland, and Diersen will sometimes hereinafter be collectively referred to as "Solicitors," or "School District Solicitors."

22.    At all times pertinent hereto, Township was acting by and through its authorized agents, servants, employees, representatives, attorneys, solicitors, and ostensible agents, including but not limited to School District, County, BPAAR, School Directors, and School District Solicitors, who were at all times acting within the course and scope of their employment or apparent employment with Township, with the actual and/or apparent authority to do so, and in furtherance of the business operations and for the financial benefit of Township.

23.     At all times pertinent hereto, County was acting by and through its authorized agents, servants, employees, representatives, attorneys, solicitors, and ostensible agents, including but not limited to School District, Township, BPAAR, School Directors, and School District Solicitors, who were at all times acting within the course and scope of their employment or apparent employment with County, with the actual and/or apparent authority to do so, and in furtherance of the business operations and for the financial benefit of County.

24.     At all times pertinent hereto, the BPAAR was acting by and through its authorized agents, servants, employees, representatives, attorneys, solicitors, and ostensible agents including but not limited to School District, Township, County, School Directors, and School District Solicitors, who were at all times acting within the course and scope of their employment or apparent employment with the BPAAR, with the actual and/or apparent authority to do so, and in furtherance of the business operations and for the financial benefit of the BPAAR.

25.     At all times pertinent hereto, Township and County were expected and intended beneficiaries of the actions and inactions of School District, BPAAR, School Directors, and School District Solicitors.

## **JURISDICTION AND VENUE**

26.     This is an action for declaratory relief, specifically a declaration that a duly enacted statute in the Commonwealth of Pennsylvania, found at *72 P.S. §5020-520,* is facially unconstitutional, pursuant to *Amendments I, V, and XIV of the Constitution of the United States* and, as such, it presents a "federal question" under *28 U.S.C. §1331.*

27.     This action for declaratory relief seeks to enjoin, suspend, or restrain the assessment, levy, and collection of a tax under state law, because it is clear that a plain, speedy, and efficient remedy may not be had in the Courts of the Commonwealth of Pennsylvania and, as such, this action is not precluded, and in fact is permitted, under *28 U.S.C. §1341.*

28.     This Complaint also includes claims for compensatory and other damages against Defendants for the deprivation of Plaintiffs' rights, privileges, and immunities as secured under the Constitution and laws of the United States, including *42 U.S.C. §1983* ("Civil Rights Violations").

29.     Original jurisdiction over federal questions, generally is founded on *28 U.S.C. §§1331.*

30.     Specific jurisdiction over the Civil Rights Violations is based on *28 U.S.C. §§1343(a)(3).*

31.     Plaintiffs' right to recover damages as a result thereof is founded on *28 U.S.C. §§1343(a)(3).*

32.     Pursuant to *Federal Rule of Civil Procedure No. 5.1(a)(1)(B),* a Notice of the federal question raised with respect to a state statute, along with a copy of this Complaint, is being served on and addressed as follows: Attorney General of the Commonwealth of Pennsylvania, Strawberry Square, Harrisburg, Pennsylvania 17120.

33.     Certification by this Court is requested pursuant to *28 U.S.C. §2403.*

34.     This Court has jurisdiction over Plaintiffs' pendent state law claims pursuant to *28 U.S.C. §1367.*

35.     Venue is proper pursuant to *28 U.S.C. § 1391(b)* because the actions, omissions, and harm complained of and all claims set forth herein all occurred within and/or arose in the Western District of Pennsylvania.

## BACKGROUND

36.     Pennsylvania utilizes a system of real estate taxation as a principal means of funding local government.

37.     Each of Pennsylvania's 67 counties maintains an assessment office, which is tasked with the responsibility of assigning an assessed value to each individual parcel of real estate located within its borders.

38.     Taxing bodies within each county, which would include municipal governments (cities, boroughs and townships), and public-school districts, as well as the county itself, have the power to levy taxes on parcels of real estate within their respective jurisdictions.

39.     Each taxing body establishes a millage rate, which is then multiplied by the assessed value, in order to calculate the tax that is due.

40.     Property owners then receive a tax bill every year from each taxing body.

41.     Thus, while the assessed value is the same on each bill, the millage rate will vary depending on the taxing body.

42.     At present, there are three distinct legislative schemes governing the law of tax assessment in Pennsylvania.

43.     Assessment law in Allegheny County, where the real estate in question is located, is governed by the "*General County Assessment Law,*" found at *72 P.S §5020 et seq,* modified by the "*Second Class County Assessment Law,*" found at *72 P.S §5452.1 et seq.*

44.     Philadelphia County is also governed by the General County Assessment Law but is modified by a *"First Class County Assessment Law,"* found at *72 P.S §5341.1 et seq.*

45.     All other counties fall under the *"Consolidated County Assessment Law,"* found at *53 Pa. C.S. §8801 et seq.*

46.     At one time, the *General County Assessment Law* was of wider application.

47.     Over the years, there have been changes and amendments to the texts and numbering of the various statutory provisions.

48.     Allegheny County uses a "base year" system of assessment.

49.     Specifically, in the first, or base, year, the County's Office of Property Assessments will conduct a countywide general assessment, whereby each individual parcel of real estate is appraised, and a fair market value determined. See *General County Assessment Law, 72 P.S. §5020-402, and Allegheny County Administrative Code, Article 209.*

50.     The fair market value then becomes the assessed value.

51.     In years subsequent to the base year, a disparity develops between the assessed values and the actual fair market values due to several factors, including general inflation.

52.     Nevertheless, absent a "triggering event," such as a casualty loss or major improvements or construction, the Office of Property Assessments does not have legal authority to revise an individual assessment.

53.     When a triggering event does occur, the Office of Property Assessments will revise, or allegedly "equalize" the assessment by application of a Common Level Ratio (CLR).

54.     Determination of the CLR is a complex legal matter in and of itself, but, for purposes of this lawsuit, it can generally be said that it is an expression of an average appreciation of property values, in a given county, for a given year.

55.     The CLR is used by the Office in an attempt to calculate a new "equalized" assessed value that is expressed as a percentage of the current fair market value.

56.     One of the many obvious flaws in the CLR is that it assumes that all property within the county uniformly appreciates at the same average rate.

57.     However, the more time that elapses between countywide assessments, the greater the overall degree of inaccuracies that will manifest themselves, not only in the value of the assessments, but in the relationship of those values to one another.

58.     The only true remedy for the imbalances that inevitably occur during periods between countywide assessments is to conduct re-assessments on a regular basis.

59.     There is no legislative requirement, however, that Pennsylvania counties do so. See *Clifton v. Allegheny County, 600 Pa. 662, 969 A.2d 1197 (Pa. S.Ct. 2009).*

60.     In Allegheny County, the last countywide general assessment that was conducted was for the 2012 tax year.

61.     In neighboring Butler County, the last countywide general assessment was in 1969.

62.     During the transitional period between county-wide assessments, taxing bodies typically adjust for general inflation by raising their millage rates.

63.     When a long period of time elapses since the last countywide reassessment, it is not uncommon to see taxes calculated by the application of artificially low assessed values against relatively high millage rates.

64.     When a countywide reassessment does take place, taxing bodies are generally required to lower their millage rates, so as to render the reassessment "revenue neutral," or at least within a certain percentage of increase. See *16 P.S. §5980.2, 53 P.S. §8823, and 53 P.S. §6926.327.*

65.     In addition to its powers of general assessment, each Pennsylvania county is vested with the authority to hear assessment appeals, that is, specific legal challenges to the assessed value of individual parcels of real estate.

66.     In Allegheny County, this task is performed by the BPAAR. See *Allegheny County Administrative Code, Article 207.*

67.     Thus, when a taxpayer feels that their property is over-assessed, an administrative action can be brought before the BPAAR, seeking to have the assessment lowered.

68.     While it is possible to challenge the accuracy of the base year value, the much more common scenario is one where the taxpayer seeks an adjustment of the assessment by presenting evidence as to the current fair market value and then multiplying it by the CLR. See *General County Assessment Law, 72 P.S. §5020-511 and Second-Class County Assessment Law, 72 P.S. §5452.4.*

69.     It is not necessary for a taxpayer's property to decline in value for an appeal to be advantageous.

70.     In any situation where a taxpayer's property value has failed to keep pace with the county's "average appreciation" as reflected in the CLR, an appeal to the BPAAR will typically result in a lowered assessment.

71.     The General County Assessment Law also contains a reciprocal provision that enables a taxing body to file a direct appeal with the BPAAR seeking to have the assessment on a particular property raised, which is typically done where the taxpayer's property value has outpaced the county average, as reflected in the CLR. See *General County Assessment Law, 72 P.S. §5020-520.*

72.     In such cases, taking the current fair market value, and multiplying it by the CLR, will result in a higher assessment.

73.     These types of actions are often sought by public school districts, which are political subdivisions and whose millage rates are generally the highest.

~~74.~~     Hence, they are often referred to, colloquially, as "school district appeals."

75.     Enabling legislation for taxing body appeals sets forth no guidance, restriction, definition, or limitation on this power, of any kind.

76.     Simply put, each taxing body has extraordinarily broad discretion on whether or not to file an appeal subject, of course, to "as applied" constitutional parameters.

77.     As such, the corporate boards of each taxing body, be it the county, city, borough, township, or school district, at any point in time are free to adopt an assessment appeal policy of its own choosing.

78.     Unlike legislative acts, such as statutes or ordinances, there is no legal requirement that these taxing body assessment appeal policies be articulated, committed to writing, or disseminated to the public, nor that they be consistently or uniformly applied.

79.     There are taxing bodies, however, who believe it is good practice to do so.

80.     Others do not believe it is good practice to do so, and some have even been known to develop their policies under the cloak of attorney-client privilege.

81.     A particular *genre* of tax assessment appeal policy that has become pervasive over the years, is the so-called "newcomer tax."

82.     In Pennsylvania the sale of a property, at an elevated price, is not considered a "triggering event," for purposes of re-assessment.

83.     County assessment boards are thus prohibited from this, or any other form, of "spot assessment."

84.     Municipalities and School Districts, however, are not boards of assessment.

85.     As such, they are able to achieve the same result, through a *"de facto"* spot assessment, by way of exercise of their discretionary assessment appeal powers.

86.     The "newcomer tax" selection process typically begins with the employment of attorneys or consultants, who trawl though public records documenting recent sales of properties, and compare sales prices with the imputed fair market values, as determined by multiplying the current assessment by the CLR.

87.     When this "lost revenue" analysis reaches an often vague, discretionary, pre-determined threshold, suit is filed against the new owner of the property.

88.     Even among taxing bodies who adopt a newcomer tax policy, the specific details of each policy can vary widely.

89.     Within the professional legal community of Allegheny County, litigation of tax assessment appeals has become somewhat of a cottage industry in which bias in favor of the taxing agencies, blurred lines of accountability and oversight, and a reckless disregard for governmental checks and balances has turned mere agency functions into a wild-west, three-ring circus.

90.     There are lawyers who specialize in representing taxing bodies, and lawyers who specialize in representing taxpayers.

91.     There are also lawyers who sit on administrative or quasi-administrative boards, whose responsibility it is to adjudicate or "conciliate" individual controversies over the valuation of properties.

92.     In any given year, there are thousands of these valuation cases, the majority of which are initiated by taxing bodies, winding their way through the BPAAR administrative process, as well as the second level "Board of Viewers," appointed by the Court of Common Pleas of Allegheny County.

93.     In addition to those cases where the sole issue is valuation, appellate courts are often called upon to decide whether a particular process or procedure, adopted by a taxing body in selecting properties for appeal, falls within constitutional parameters.

94.     This is typically done through a taxpayer-initiated, "as-applied" constitutional challenge.

95.     Court decisions in this area are handed down on a regular basis; however, the pace of the judicial process cannot match that of the taxing bodies in crafting their selection processes, let alone the creativity of same.

96.     The result has been a body of law that is neither stable, nor predictable and essentially constitutes "legislation through litigation," and, in every sense of the word, is a sham.

97.     The instant case presents a constitutional challenge, albeit not one of the "as-applied" variety.

98.     Rather, in this first-of-its-kind claim for declaratory relief, Plaintiffs are seeking a determination by this Court, that the enabling legislation for taxing body appeals, found at *72 P.S. §5020-520,* is, in and of itself, facially unconstitutional, in that it is in direct conflict with *Amendments I, V, and XIV of the Constitution of the United States.*

99.     For many years, Plaintiffs have attempted to present this simple constitutional issue in all three levels of the Pennsylvania court system; however, their efforts have been frustrated and interminably delayed by an aggressive and systematic censorship and obfuscation campaign,

conducted by Defendants, particularly the School Directors and ~~the~~ its Solicitors, that rises to the level of a deprivation of Plaintiffs' civil rights, in direct violation of *42 U.S.C. §1983*.

100.    The state court records also reflect that, as a direct consequence of Defendants' lawfare campaign, no plain, speedy, and efficient remedy may be had in the Courts of the Commonwealth of Pennsylvania, inasmuch as, over a period of some four years, all three levels of those courts have refused to hear Plaintiffs' case or act upon their filings and, thus, the within action is not precluded under *28 U.S.C. §1341*.

## ADMINISTRATIVE PROCEEDINGS BEFORE THE BPAAR

101.    On September 4, 2020, Plaintiffs purchased the property located at 2328 West Hardies Road, Gibsonia, Pennsylvania 15044 which is in Hampton Township ("Property") for $185,000.

102.    The Property consists of a one-half acre lot and small cabin ("Cabin").

103.    The County assigned the Property Parcel Identification No. 1210-S-00133.

104.    When Plaintiffs purchased the Property its assessed value, as assigned by the Allegheny County Office of Property Assessments, was $109,200 which reflected the fair market value of the Property as of the 2012 base year.

105.    In deciding to purchase the Property, Plaintiffs substantially relied upon the base year assessment, and the corresponding amount of property taxes that would be levied.

106.    On February 23, 2021, the School District, acting through its Solicitors, filed an assessment appeal with the BPAAR, that specifically targeted Plaintiffs and the Property, in which it sought a significant increase in the Property's assessment.

107.    The School District, acting through its Solicitors, and specifically Palmer served Plaintiffs with the appeal.

108.     In his cover letter, Palmer wrote: "The appeal was filed because the current assessment appears to understate the value of the property significantly, specifically in reference to the recent purchase price of the property."

109.     Under the *Second-Class County Assessment Law,* at *72 P.S. §5452.10(c),* the BPAAR is required to determine the "current market value tax year in question" as well as the "fair market value as determined with Section 402 of the General County Assessment Law."

110.     That provision, found at *72 P.S. §5020-402,* provides that "In arriving at actual value the price at which any property may actually have been sold either in the base year or the current taxable year, shall be considered but shall not be controlling."

111.     The BPAAR operates on an informal system of rules and regulations, promulgated pursuant to *72 P.S §5452.11,* and the *Allegheny County Administrative Code, Article 207,* which, among other things, allows for "relaxed" rules of evidence, during administrative hearings.

112.     On May 12, 2021, the BPAAR conducted an eight-minute telephonic hearing with respect to the School District's appeal ("Administrative Hearing").

113.     Leyland appeared on behalf of the School District and Mr. Bentivegna appeared on behalf of Plaintiffs.

114.     Based on Plaintiff's recent purchase of the Property, the School District contended that the current fair market value of the Property was $185,000.

115.     During the Administrative Hearing and in support of their position, School District introduced into evidence the Deed to the Property which confirmed the purchase price of $185,000, together with hearsay evidence consisting of three unsworn and unauthenticated printouts of allegedly "comparable" sales reports, that were apparently obtained from the internet.

116.     School District did not call any witnesses to testify during the Administrative

Hearing and, therefore, they failed to present any testimony or evidence to support the allegedly "comparable" sales reports.

117.    The only sworn testimony that was presented during the Administrative Hearing was by Mr. Bentivegna who testified that the Cabin was deteriorated, and in need of substantial repair and, as a result, the actual value of the Property was substantially less than $185,000.

118.    School District did not present any testimony or evidence to refute Mr. Bentivegna's testimony.

119.    By a mailing dated June 11, 2021, the BPAAR issued a Disposition of Appeal from Real Estate Assessment ("Disposition"), amounting to a *de facto* spot assessment on the Property which raised the assessed value, from $109,200, to $161,900, a difference of $52,700, and a percentage increase of over 48%.

120.    Although the Disposition did not provide any explanation as to how the Board calculated the new assessment, it is clear the BPAAR first determined that the fair market value of the Property was $185,000 which it multiplied by the 2021 Common Level Ratio for Allegheny County, which was .875, to arrive at the $161,900 (rounded) figure.

121.    Following its decision, the BPAAR immediately and retroactively raised Plaintiffs' property tax assessment to $161,900.

122.    As a result, for the years 2021, 2022, 2023, and 2024 Plaintiffs have been paying their real estate taxes at the increased assessment rate, and they will continue to do so during the pendency of this litigation.

123.    BPAAR's decision broke down the revised assessment into two separate values, i.e. the "Building Value" of the cabin (adjusted by CLR) which it arbitrarily and capriciously increased from $57,600 to $110,300, an appreciation of nearly 92%, and the "Land Value" of the

half-acre lot which remained unchanged at $51,600.

124.    The revised assessment resulted in a total property tax increase for the Property in the amount of $1,442.09 for the 2021 tax year, with commensurate increases in subsequent years.

125.    The increase is calculated by taking the difference in the aggregate assessment of $52,700 and multiplying it by the 2021 millage rates for the respective taxing bodies, i.e.: for School District, the millage rate factor was .01971, resulting in a tax increase of $1,038.72, for Township, the millage rate factor was .0029241, resulting in a tax increase of $154.10, and for County, the millage rate factor was .00473, resulting in a tax increase of $249.27.

## LITIGATION BEFORE THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY AND ITS BOARD OF VIEWERS

126.    On July 8, 2021, Plaintiffs filed with the Civil Division of the Court of Common Pleas of Allegheny County ("Court") a timely appeal of the BPAAR's decision ("Appeal").

127.    As with all appeals of tax assessments originating at the Board, the Appeal was assigned by the Common Pleas Court to its "Board of Viewers,"

128.    The Appeal was assigned case number BV-21-000894.

129.    Pursuant to 42 Pa. C.S.A. *§ 21421-2144,* Boards of Viewers are appointed by Courts of Common Pleas of the county where they serve.

130.    The *General County Assessment Law,* at *72 P.S. §5020-518.1* further authorizes the Court to appoint a Board of Viewers for the specific purpose of reviewing appeals to Court from the BPAAR.

131.    In Allegheny County, a Board of Viewers with such responsibility is established and procedurally regulated under *Civil Division Local Rule No. 503.*

132.    In compliance with *Civil Division Local Rule No. 503(1),* School District, Township, and County were all named as Defendants in the Appeal and notice was given to the BPAAR, pursuant to *Local Rule 503(4).*

133.    The Appeal consisted of two counts: (1) a standard BV appeal as to valuation, in a form substantially similar to that prescribed by *Rule No. 503(3) of the Local Rules of the Civil Division,* and (2) an equitable complaint for declaratory relief and challenge to the constitutionality of the legislation that enables the School District's initial assessment appeal as set forth in the *General County Assessment Law,* found at *72 P.S §5020-520* ("Count II").

134.    The latter count is the same issue that is being raised in this litigation.

135.    Pursuant to *Pa. R.C.P. No. 235,* notice of the constitutional challenge was given to the Attorney General of the Commonwealth of Pennsylvania.

136.    On July 27, 2021, the School District, acting by and through Solicitors, filed preliminary objections in which they sought to strike Count II, in its entirety, based on their assertion that the Court lacked subject matter jurisdiction over the constitutional issue.

137.    Oral argument on the School District's preliminary objections was held on October 4, 2021, before the Honorable Arnold Klein ("Argument") with Leyland appearing on behalf of the School District.

138.    Judge Klein refused to decide the preliminary objections, but rather, he insisted that the parties work together to amicably resolve the issue by stipulation.

139.    In compliance with Judge Klein's directive, the parties agreed to a Case Management Order that deferred the constitutional challenge until the conclusion of the Board of Viewers proceedings and, at that point, if the case had not been resolved, upon a motion by either party, the case would be transferred to the Court's general docket.

140.    For approximately nine months, the Board of Viewers failed to take any action.

141.    By a Notice of Conciliation dated July 7, 2022 ("Notice"), the Board scheduled a conciliation/hearing for July 27, 2022 ("Hearing").

142.    The Notice contained the following boldface warning:

> **In the event you fail to appear and you have not requested a postponement, the parties present shall proceed without you and a resolution, either by hearing or negotiated by the parties appearing, may be reached and may result in a change in the assessment and a tax surcharge for the years of appeal.**

143.    *Local Rule 503(11) of the Allegheny Court of Common Pleas, Civil Division,* sets forth the procedure for the conduct of proceedings before the Board of Viewers and states as follows:

> (11) **Conciliation**
>
> (a) All appeals shall be conciliated prior to a hearing by a panel of the Board of Viewers assigned to hear the appeal.
>
> (b) At the time of conciliation all parties or their counsel shall be present with full authority to effectuate a settlement of the appeal
>
> *Note:* Parties and counsel are advised to take particular attention to the notice of conciliation. In appropriate cases, the conciliation and hearing may be scheduled on the same day. In such instances, the parties must appear at the conciliation ready to move directly into a hearing if the conciliation does not result in a settlement. [Emphasis supplied.]

144.    The effect of both the Notice and the Local Rule is that, if the case does not settle during the conciliation, counsel must be fully prepared to proceed with an immediate formal trial on the valuation issue.

145.    In accordance with the Notice and Local Rule, Mr. Bentivegna arrived on time and were prepared to proceed with the Hearing as scheduled.

146.    Mr. Bentivegna quickly learned that there was no "panel" to hear the case.

147.   Rather, a single Hearing Officer, Mary D. Colville ("Hearing Officer"), was assigned to handle the case.

148.   Even though it was a party to the proceedings the School District and Solicitor did not timely appear for the Hearing.

149.   Following a delay, the Hearing Officer placed a cellphone call to "Kate," to advise that Mr. Bentivegna was present and ready to proceed with the Hearing.

150.   A short time later, Diersen appeared on behalf of the School District.

151.   Diersen offered a small reduction in the assessment, but was otherwise unwilling to negotiate or discuss any terms that might lead to a settlement of the matter.

152.   When Mr. Bentivegna attempted to introduce the constitutional challenge into the discussions. Diersen scoffed at the suggestion and the Hearing Officer stated that "You will need to ask the judge about that one."

153.   When it was clear the parties would not reach a settlement, Mr. Bentivegna asked to proceed with the formal hearing.


154.   However, the Hearing Officer indicated that the Hearing would be postponed to a later date.

155.   The Hearing was postponed because the School District and Diersen were not prepared to proceed with the Hearing, despite the directives set forth in the Notice of Conciliation and the Local Rule.

156.   Unfortunately, the Hearing Officer did not reschedule the Hearing.

157.   Instead, some three months later, the Hearing Officer issued a second Notice of Conciliation, which was substantially the same as the first, that scheduled another

conciliation/hearing for November 9, 2022 ("Hearing 2").

158.    Despite being in poor health, Mr. Bentivegna once again prepared for Hearing 2, traveled the 80 miles from his home to the courthouse, and timely appeared for Hearing 2 which was scheduled before the Hearing Officer.

159.    This time, Leyland appeared on behalf of the School District.

160.    John M. Daley, Esquire, the Solicitor for the County ("Mr. Daley"), who had not previously entered his appearance, nor filed any evidence, also appeared at the Hearing.

161.    During the conciliation portion of Hearing 2, School District offered another "take-it-or-leave it" settlement proposal, albeit one more that was a little more generous than the one previously offered by School District.

162.    When Mr. Bentivegna again raised the constitutional issue, Leyland indicated that he was not concerned that Plaintiffs would proceed with the constitutional claim, particularly given the small amount of money involved.

163.    Mr. Bentivegna understood Leyland's statement to mean that Plaintiffs could not match the financial resources of the School District, nor the legal muscle of its Solicitors.

164.    Mr. Bentivegna then asked to proceed with Hearing 2.

165.    Mr Daley, on behalf of the County, objected to Mr. Bentivegna's request to proceed with Hearing 2, claiming that he had a "dentist appointment."

166.    The Hearing Officer refused to proceed with Hearing 2 but promised to promptly schedule a third hearing.

167.    Unfortunately, the Hearing Officer did not schedule a third hearing in a timely manner.

168.    Finally, on December 15, 2022, seventeen months after Plaintiffs filed the Appeal,

Plaintiffs filed with the Court a Motion to Transfer the case to the general docket ("Motion to Transfer") so Plaintiffs could proceed on the constitutional issue.

169.    Oral argument on the Motion to Transfer was held on December 29, 2022 before the Honorable Alan D. Hertzberg.

170.    Following oral argument, Judge Hertzberg granted the Motion to Transfer and effectively bifurcated the Appeal

171.    Specifically, Judge Hertzberg transferred the constitutional portion of the Appeal to the general docket where it was assigned Docket No. GD-22-016257 ("GD Case") and he directed that the matter before the Board continue simultaneously at Docket No. BV-21-894 ("BV Case") (collectively, "Underlying Actions").

172.    The School District Solicitors were infuriated by Judge Hertzberg's decision to put the constitutional issue on a path toward adjudication, and, on January 10, 2023, School District filed a Petition for Reconsideration of Judge Hertzberg's Order.

173.    In the Petition, School District claimed that the Order entered by Judge Klein on October 4, 2021, by attorney stipulation, was effectively a Consent Decree, and thus a "binding contract" between the parties, as well as essentially being an irrevocable waiver of Plaintiffs' constitutional rights.

174.    Following oral argument, Judge Hertzberg properly denied the Petition for Reconsideration.

### SCHOOL DISTRICT'S INTERLOCUTORY APPEAL
### TO THE COMMONWEALTH COURT OF PENNSYLVANIA

175.    On January 26, 2023, the School District, by and through Solicitor, filed with the Commonwealth Court of Pennsylvania interlocutory appeals of the GD Case and the BV Case (collectively, "Appeals").

176.    The appeal of the GD Case was assigned case number 86 CD 2023 and the appeal of the BV Case was assigned case number 87 CD 2023.

177.    The School District claimed that Judge Hertzberg's Order of December 29, 2022 was a "collateral order appealable as of right pursuant to Pa. R.A.P. 313."

178.    Pursuant to *Pa. R.A.P. No. 1701*, the Appeals resulted in a stay of the Underlying Actions.

179.    In their "Concise Statement of Errors Complained of on Appeal," the School District maintained that "the Court committed an error of law by modifying the plain terms of the Consent Order between the School District and Appellants Nicholas and Teresa Bentivegna ("Appellants"), absent a showing by Appellants of fraud, accident, and mistake."

180.    By Order dated May 2, 2023, the Commonwealth Court consolidated the Appeals and, on May 3, 2023 a briefing schedule was issued.

181.    The School District's Brief was filed on June 12, 2023, Plaintiffs' Brief was filed on June 26, 2023 and the School District filed a Reply Brief on July 7, 2023.

182.    On August 11, 2023 the Commonwealth Court, on its own Motion, ordered "Appellees Hampden [sic] Township and Board of Property Assessment Appeals and Review of Allegheny County" to file briefs within 14 days.

183.    The due date for the filing of those Briefs was August 25, 2023.

184.    In direct violation of the August 25, 2023 Order, to date, none of the other Appellees have filed a Brief.

185.    Although the matter has been ripe for review since July 7, 2023, the Commonwealth Court has inexplicably not moved the matter forward, even though it has decided many subsequently filed and briefed cases.

## PLAINTIFFS EXTRAORDINARY APPEAL TO
## THE SUPREME COURT OF PENNSYLVANIA

186.    The Pennsylvania Supreme Court is vested with the plenary power to exercise extraordinary jurisdiction over cases pending in the lower courts, at any stage, where the case involves "an issue of immediate public importance." *42 Pa. C.S. § 726.*

187.    The procedure for filing an Application for Extraordinary Relief is set forth in *Pa. R.A.P. No. 3309.*

188.    Because of the Commonwealth Court's failure to act on the School District's interlocutory Appeals, on February 15, 2024, Plaintiffs filed two Applications for Extraordinary Relief with the Supreme Court of Pennsylvania that were docketed at Case Nos. 82 WM 2023 and 83 WM 2024 (collectively, "Applications").

189.    Named as responding parties in the Applications were the School District, Township, County, and BPAAR.

190.    Pursuant to *Pa. R.A.P. No. 521,* service was also made on the Attorney General of the Commonwealth of Pennsylvania.

191.    The Applications set forth the following three bases for the Pennsylvania Supreme Court to exercise extraordinary jurisdiction:

(1) To present a direct facial challenge to the constitutionality of a longstanding and widely applied statute of the Commonwealth;

(2) The constitutional question presented was one of first impression; and

(3) The constitutional question presented was one of such substantial and immediate public importance, so as to require prompt and definite resolution by the Pennsylvania Supreme Court.

192.    No response or opposition to the Applications were filed by any of the responding parties, nor the Attorney General.

193.   By *Per Curiam* Order dated May 2, 2024, the Pennsylvania Supreme Court denied the Applications without opinion or comment.

194.   Pursuant to *Pa. R.A.P Nos. 3309 and 123*, on May 9, 2024, Plaintiffs filed an Application for Reconsideration and/or Special Relief ("Reconsideration") with the Pennsylvania Supreme Court.

195.   All responding parties and the Attorney General of the Commonwealth of Pennsylvania were served with the Reconsideration.

196.   In their Reconsideration, Plaintiffs provided a detailed recital of the procedural history of the Underlying Actions, and set forth the following averments:

(1)   That *72 P.S §5020-520* was unconstitutional on its face;

(2)   That by virtue of Applicants' Appeal Petition of July 8, 2021, the responding parties and the Solicitor had been placed on notice that the constitutionality of *72 P.S §5020-520* had been called into question;

(3)   That, despite three and one-half years of protracted litigation, no responding party, nor the Attorney General of Pennsylvania, had ever filed a single pleading, objection, demurrer, motion, brief, or paper, containing any argument whatsoever, supporting or defending the constitutionality of the statute;

(4)   That all public-school directors and licensed attorneys in the Commonwealth were statutorily required to take oaths "to support, obey, and defend the Constitution of the United States and the Constitution of this Commonwealth," and to discharge the duties of their office with fidelity. See *Public School Code of 1949, at 24 P.S. Education § 3*-321 and *42 P.S. §2522;*

(5)   That the constitutional oaths required the directors and officials, along with their attorneys, to have primary responsibility for seeing to it that the policies and procedures implemented by their offices, were in compliance with constitutional parameters;

(6)   That, upon receipt of the above Petition and Notice, the constitutional oaths taken by the directors and officials, along with their attorneys, imposed upon them an affirmative obligation to evaluate their operating policies and procedures, particularly those with respect to assessment

appeals, which had been filed against a great number of other citizens, or were contemplated in the future.

(7)     That the directors and officials, along with their attorneys, also had the duty and responsibility to cooperate, in good faith, with the underlying litigation. Moreover, that their attorneys had a professional and ethical obligation to actively participate in the discovery, development and stipulation of relevant facts, none of which were substantially disputable, and to directly and competently respond to the specific and well-defined constitutional and legal issue framed by Applicants, so as to facilitate a prompt determination by the appropriate court of law;

(8)     That the course of conduct of the directors and officials, along with their attorneys, had been, demonstrably, quite the opposite. In particular, that the eleven School District directors, along with their attorneys, had embarked upon a deliberate, systematic, and aggressive legal campaign, with the specific intent and purpose, of frustrating, delaying, and ultimately preventing, any judicial determination as to the merits of Applicants' constitutional claim;

(9)     That the conduct of the eleven School District Directors and their attorneys had risen beyond that of even the breach of the duties imposed upon them by their constitutional oaths of office, and that it had become abundantly clear that their legal campaign was conceived, planned, and executed with the specific intent and purpose of depriving Applicants, of rights, privileges, and immunities secured by the Constitution of the United States, under "color of law," as is unambiguously prohibited by Federal Statute, found at *42 U.S.C. §1983.*

(10)     That the Commonwealth Court had failed to act on the School District's interlocutory Appeals for a period of some seventeen months, even as it decided cases that had been subsequently filed and briefed;

(11)     That it was absolutely unconscionable that an interlocutory appeal of a routine case management order issued at the Common Pleas level would result in a delay of this magnitude, and that, were the Pennsylvania courts to tolerate this type of tactic on a regular basis, the operations of all three levels of the court system would be paralyzed, and the efficient administration of justice a complete impossibility.

(12)     From the course of the litigation, it is clear that absent an extraordinary intervention by the Pennsylvania Supreme Court, no plain, speedy, or efficient remedy was available to Applicants, within the Courts of the Commonwealth of Pennsylvania, with respect to their facial challenge to the constitutionality of *72 P.S §5020-520.*

197.    No response or opposition to the Reconsideration, nor to the specific charges made therein, was filed by any of the responding parties, nor the Attorney General.

198.    By *Per Curiam* Order dated June 28, 2024, the Pennsylvania Supreme Court denied Reconsideration without opinion or comment.

199.    No further action has been taken by the Commonwealth Court.

200.    Rather, as of the date of filing this Complaint, the Commonwealth Court's docket indicates: "Awaiting Appellee Paperbooks."

201.    By way of comparison, a subsequently filed appeal of a final Order issued by Judge Hertzberg, involving a rather esoteric tax assessment issue, has already been filed, briefed, argued, decided on the merits, and the case closed by the Commonwealth Court, within the time this case has been pending. See *Gioffre v. Allegheny County BPAAR, Docket No. 424 CD 2023.*

202.    It is inexplicable that an interlocutory appeal of a routine case management order issued at the Common Pleas Court level would result in a delay of this magnitude.

203.    Plaintiffs find it impossible to believe that the appellate courts of Pennsylvania would tolerate or enable this type of dilatory, obdurate, and vexatious tactic on a regular basis as to do so would paralyze the operations of all three levels of the court system and render the efficient administration of justice a complete impossibility.

204.    At a time when public confidence in the judiciary and the institutions of government has reached an all-time low, it is not a "good look" for our court systems to be sitting on the sidelines, while elected officials, administrators, officers of the Court, and judicial officers act with disregard or indifference to our constitutional form of government.

205.    Simply stated, a constitution that cannot be enforced is no constitution at all.

## COUNT I

## PLAINTIFFS V. DEFENDANTS, HAMPTON TOWNSHIP SCHOOL DISTRICT, HAMPTON TOWNSHIP, AND ALLEGHENY COUNTY

## PETITION FOR DECLARATORY RELIEF: DECLARATION THAT THE PENNSYLVANIA STATUTE FOUND AT 72 *P.S §5020-520* IS UNCONSTITUTIONAL

206.    Plaintiffs incorporate herein by reference paragraphs 1 through 205 above as though fully set forth at length.

207.    The specific statutory provision Plaintiffs seek to challenge is found in the General County Assessment Law, at *72 P.S §5020-520* and reads as follows:

**§ 5020-520.    Appeals by municipalities**

The corporate authorities of any county, city, borough, town, township, School District or poor district, which may feel aggrieved by any assessment of any property or other subject of taxation for its corporate purposes, shall have the right to appeal therefrom in the same manner, subject to the same procedure, and with like effect, as if such appeal were taken by a taxable with respect to his property.[1]

208.    Also germane is a provision related to constitutional construction that is found in the *General County Assessment Law* at *72 P.S §5020-106.*

---

[1] As mentioned above, the *General County Assessment Law* is only applicable to Allegheny and Philadelphia Counties.  A parallel provision, applicable to the remaining 65 Pennsylvania counties, is found in the *Consolidated County Assessment Law*, at *53 Pa.C.S. §8855,* which reads:

A taxing district shall have the right to appeal any assessment within its jurisdiction in the same manner, subject to the same procedure and with like effect as if the appeal were taken by a taxable person with respect to the assessment, and, in addition, may take an appeal from any decision of the board or court of common pleas as though it had been a party to the proceedings before the board or court even though it was not a party in fact. A taxing district authority may intervene in any appeal by a taxable person under section 8854 (relating to appeals to court) as a matter of right.

Though more artfully drafted than *72 P.S §5020-520*, Plaintiffs maintain that this provision is similarly unconstitutional, on its face.

**§ 5020-106 Constitutional construction**

The provisions of this act shall be severable, and if any of the provisions shall be held to be unconstitutional, such decision shall not affect the validity of any of the remaining provisions of this act. It is hereby declared as the legislative intent that this act would have been adopted had such unconstitutional provision not been included therein.

209.    Plaintiffs submit that *72 P.S §5020-520,* purporting to enable taxing bodies, and in particular public-school districts, to file assessment appeals, directly against individual citizen taxpayers is facially unconstitutional in that it is violative of *Amendments I, V, and XIV, of the Constitution of the United States.*

210.    There are no less than three separate bases upon which to base their facial unconstitutional challenge to the constitutionality of *72 P.S. §5020-520,* any one of which provides sufficient cause to strike the statute off the books, specifically:

(1) *72 P.S. §5020-520* is unconstitutional on its face under *Amendment I* of the *Constitution of the United States,* in that the petitions brought under the statute are shams, used in furtherance of improper purposes without accountability or oversight;

(2) *72 P.S. §5020-520* is unconstitutional on its face in that it is vague in violation of the Due Process Clauses found in the *Amendments V and XIV, of the Constitution of the United States;* and

(3) *72 P.S. §5020-520,* by its plain language and by its effect, violates the Equal Protection Clause, found in *Amendment XIV of the Constitution of the United States* as there is no rational basis for the inherent differing in application of the statute from agency to agency

WHEREFORE, Plaintiffs, Nicholas Bentivegna and Teresa Bentivegna, respectfully request that this Court award them the following declaratory relief:

(1) Finding that the Commonwealth of Pennsylvania Statute found at 72 P.S §5020-520 is unconstitutional;

(2) Setting aside the de facto spot assessment of the Property retroactive to Tax Year 2021; and

(3) Ordering Defendants, Hampton Township School District, Hampton Township, and Allegheny County to issue a refund to Plaintiffs the tax overpayments they have made since 2021, together with pre- and post-judgment interest, according to law.

## COUNT II

## PLAINTIFFS v. ALL DEFENDANTS

## DEPRIVATION OF CIVIL RIGHTS SECURED BY THE UNITED STATES CONSTITUTION UNDER COLOR OF LAW AS PROHIBITED BY *42 U.S.C. §1983.*

211. Plaintiffs incorporate herein by reference paragraphs 1 through 210 above as though fully set forth at length.

212. The assessment appeal the School District filed against Plaintiffs was one of 152 appeals the School District authorized, by unanimous vote, at its regular meeting of February 8, 2021.

213. The Appeals were authorized based on a computation "where the difference between the adjusted purchase price and the 2021 assessment reflects a lost revenue to the District in the amount of $1,000 or more at the current 2019-2020 millage rate of 19.38 mills." See *Board Meeting Minutes; Hampton Township School District, February 8, 2021.*

214. The above-described "selection process" developed by School Directors and Solicitor and employed by School District, essentially operates in the manner of a "reverse class action," whereby costs and legal expenses to the School District are amortized over a large quantity of substantially similar appeals are shams, that enable the School District to take advantage of the heavily biased, informal, abbreviated, and sloppily implemented Board adjudication process.

215.    The School District's selection process places a unique burden on the individual taxpayer, in terms of the costs and resources necessitated to provide a suitable defense which is particularly true in cases involving incrementally small tax increases (in terms of the cash difference, as opposed to the percentage increase), such as those in the instant case, where it is ordinarily not cost effective for the taxpayer to hire a lawyer, commission an appraisal, or to mount a defense to the litigation, and those costs are compounded if the taxpayer elects to undertake a formal appeal to the Court of Common Pleas.

216.    The School District's selection process provides a significant political advantage to the incumbent School Directors, in that, as an alternative to raising taxes on longtime homeowners and voters through a uniformly applied increase in millage rates, the process targets and freezes concentrated tax increases upon a relatively small number of new residents and first-time home buyers many of whom may be in the lower or middle classes.

217.    *Article 6, §3* of the *Constitution of the Commonwealth of Pennsylvania* requires that Senators, Representatives, and all judicial state and county officers shall, before entering on the duties of their respective offices, take and subscribe the following oath or affirmation:

> "I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth, and that I will discharge the duties of my office with fidelity."

218.    An identical Oath of Office is statutorily required of any person elected or appointed as a public-school director in the Commonwealth. *Public School Code of 1949, at 24 P.S. Education § 3-321.*

219.    As such, each of the eleven School Directors was required to take the Oath, before assuming the duties of their office.

220.    A similar, yet more expansive, Oath of Office, prescribed in *42 P.S. §2522,* is required of every attorney licensed to practice in the Commonwealth of Pennsylvania:

> "I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth, and that I will discharge the duties of my office with fidelity, as well as to the court as to the client, that I will use no falsehood, nor delay the cause of any person for lucre or malice." [Emphasis supplied.]

221.    A Constitutional oath is a solemn acknowledgement of our very precious and fragile system of government, and of appreciation for the sacrificial efforts of our founding fathers, as well as countless public servants, soldiers, sailors, and ordinary citizens, who have gone before us, many of whom paid to support, defend, and obey these Constitutions, with their blood.

222.    The obvious implications of the above-described Constitutional oaths is that each of the Defendants had a primary duty and responsibility for seeing to it that the policies and procedures implemented by their offices, were in compliance with constitutional parameters.

223.    Where a good faith challenge to one of those policies or procedures had been lodged in Court, the Defendants, both as stewards of the public trust and as citizens themselves, had a clear and compelling obligation to see to it that the constitutional claim was fairly and expeditiously adjudicated, regardless of what the outcome might be.

224.    When Plaintiffs filed their Appeal on July 8, 2021 each of the Defendants, including, specifically, the individual School Directors, were placed on notice that the constitutionality of *72 P.S §5020-520* was being challenged.

225.    Upon receipt of the above Petition and Notice, the Constitutional oaths each Defendant took imposed upon them an affirmative obligation and responsibility to evaluate their operating policies and procedures, particularly those with respect to assessment appeals, which

had been filed against a significant number of other citizens or were contemplated to be filed in the future.

226.    Upon receipt of the above Petition and Notice, the Constitutional oaths each Defendant took imposed upon them an affirmative obligation and responsibility to act in good faith to expeditiously advance all litigation relating to the Property, as well as all other constitutional challenges to the way they re-assessed properties.

227.    The obligation and responsibility reached well beyond that of artfully dodging or simply ignoring the defenses raised in lawsuits that the School District files against its constituents.

228.    Simply stated, each Defendant had a professional and ethical obligation to actively advance all litigation, particularly litigation they filed, and to participate in the discovery, development, and stipulation of relevant facts, and to directly and competently respond to the specific and well-defined constitutional and legal issues at issue in the litigation, so as to facilitate a prompt determination by the appropriate court of law.

229.    In this case, each of the Defendants has engaged in the exact opposite course of conduct.

230.    Specifically, School District, School Directors, and Solicitors have engaged in a deliberate, systematic, and aggressive obfuscation campaign, with the specific intent and purpose, of frustrating, delaying, and ultimately preventing, any judicial determination of the merits of Plaintiffs' constitutional law claim.

231.    The conduct of the School Directors and Solicitors has risen well beyond that of even the breach of the duties imposed upon them by their Constitutional oaths of office.

232.    It has become abundantly clear that their obfuscation campaign, which was initiated under color of state law, was conceived, planned, and executed with the specific intent and purpose

of depriving Plaintiffs of the rights, privileges, and immunities that are secured by the Constitution of the United States which is unambiguously prohibited by *42 U.S.C. §1983.*

233.     Township, County, and BPAAR have been complicit in, and tacitly approved, the lawfare campaign, and have directly benefitted from it by the increased levels of taxation imposed upon Plaintiffs and other citizens and taxpayers.

234.     The School District's lawfare campaign essentially began on July 27, 2021, with Solicitor's filing of ill-conceived and ill-fated preliminary objections by Solicitors in the Appeal and has persisted to the present in that it has made no effort to advance the litigation to conclusion.

235.     By and through the Board of Viewers procedure and the other pending litigation, School District, School Directors, and Solicitors have intentionally delayed and prevented the prompt adjudication of Plaintiffs' constitutional law challenge, all in an effort to protect and preserve their illegal and unconstitutional practice of filing annual assessment appeals.

236.     *72 P.S §5020-520* is obviously unconstitutional as evidenced by the fact that despite some three and one-half years of protracted litigation in the Pennsylvania Courts, Defendants and the Attorney General of Pennsylvania have failed to submit and filings in the Appeals which the Pennsylvania Commonwealth Court is using as the basis for allowing the Appeals to remain dormant.

237.     As a sole, direct, proximate, factual, and legal result of Defendants individual and collective conduct as aforesaid, Plaintiffs have suffered the following injuries, damages, and harm, all of which may be permanent in nature:

        a.    The deprivation of their constitutional rights and privileges;

        b.    They have been assessed and compelled to pay property taxes they do not owe which must be refunded with interest;

     c.      They have suffered and will continue to suffer severe emotional distress, mental anguish, inconvenience, and a loss of life's pleasures;

     d.      Mr. Bentivegna, who is a licensed attorney, has been compelled to expend significant time and financial resources to oppose Defendants' illegal and unconstitutional conduct;

     e.      Plaintiffs have incurred and will continue to incur significant attorneys' fees and costs;

     f.      Other compensable damages and losses as provided by statute; and

     g.      All other pecuniary and monetary losses that will be proven at trial.

238.    Defendants' individual and collective conduct as aforesaid was and is intentional, willful, wanton, malicious, and in reckless disregard of Plaintiffs' constitutional rights and privileges and warrants the imposition of punitive damages in favor of Plaintiffs and against each of the Defendants.

WHEREFORE, Plaintiffs, Nicholas Bentivegna and Teresa Bentivegna respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, for compensatory damages, punitive damages, attorneys' fees, costs, interest, and such other relief as this Court deems appropriate.

Respectfully submitted,

**THE FARNETH LAW GROUP, LLC**

January 20, 2025

By:_____
George R. Farneth II, Esquire
445 Fort Pitt Blvd., Suite 160
Pittsburgh, PA 15219
Tel: (412) 863-7092
Fax: (412) 586-4713
Email: grf@farnethlaw.com
PA ID #53914
WV ID #10749

**BRENLOVE & FULLER, LLC**

By: *s/Nicholas A. Miller*
Nicholas A. Miller, Esq.
401 Washington Avenue
Bridgeville, PA 15017
412-221-0640 x 112
Fax: (412) 257-8040
Email: nmiller@brenlovefuller.com
PA ID: 204141
Attorneys for Plaintiffs